## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

| | | |
|---|---|---|
| CHARLES CAYCE | | PLAINTIFF |
| v. | | No. 4:24-cv-86-BJB |
| VGW, LTD., ET AL. | | DEFENDANTS |

\* \* \*

| | | |
|---|---|---|
| CHARLES CAYCE | | PLAINTIFF |
| v. | | No. 4:24-cv-87-BJB |
| ZYNGA, INC. | | DEFENDANT |

\* \* \*

| | | |
|---|---|---|
| DIANNE FUQUA | | PLAINTIFF |
| v. | | No. 4:24-cv-88-BJB |
| PLAYTIKA, LTD. ET AL. | | DEFENDANTS |

\* \* \*

| | | |
|---|---|---|
| WADE JENKINS | | PLAINTIFF |
| v. | | No. 4:24-cv-90-BJB |
| DOUBLEDOWN INTERACTIVE LLC | | DEFENDANT |

\* \* \*

| | | |
|---|---|---|
| CLAY MANNING GUNKEL | | PLAINTIFF |
| v. | | No. 4:24-cv-92-BJB |
| HUUUGE, INC. ET AL. | | DEFENDANTS |

\* \* \* \* \*

### OPINION AND ORDER

In these cases, five Plaintiffs seek all the money lost, anywhere in Kentucky, by everyone who has played the Defendants' "social casino" games. These video games "simulate gambling activities" by selling users "virtual currency" (ordinarily in exchange for *real* currency) used to play games that offer winners "no tangible prize[s]." Gainsbury, et al., *A Taxonomy of Gambling and Casino Games via Social Media and Online Technologies*, 14 INT'L GAMBLING STUDS. 196, 203 (2014). The Plaintiffs never played the games themselves, mind you. *Other* people use the Defendants' software applications, the Plaintiffs say, and have spent—which is to say lost—millions spinning slots in these so-called casinos. *See, e.g.*, Complaint in No. 4:24-cv-86 (DN 1) ¶¶ 5, 13. To the Plaintiffs' minds, these online games amount to illegal "betting, gaming, or wagering." KY. REV. STAT. § 372.010. And each non-player Plaintiff lays claim to players' losses under a Kentucky statute allowing "any … person" to sue for "treble the value of the money … lost" by a gambler who hasn't already sued to recover his or her own losses. KY. REV. STAT. § 372.040.

1

This eyebrow-raising claim about the 21st-century phenomenon of ubiquitous online gaming apps boasts a longer pedigree than might be expected. Back in 1798, Kentucky's General Assembly enacted a law modeled after the "Statute of Anne," promulgated in England nearly 90 years before. *See* 9 Ann. c. 14, 9 STATUTES OF THE REALM 476 (1710). Like its Old World ancestor, Kentucky's statute provides that any "contract" or "transfer … for the purpose of gaming … is void." KY. REV. STAT. § 372.010. To further dissuade would-be gambling bosses, the statute also authorizes a losing gambler to sue the winner for the "value" of his losses. § 372.020. And, again like the Statute of Anne, Kentucky's statute includes a backstop rule that applies when the loser doesn't sue within six months: "any other person may sue the winner, and recover treble the value of the money or thing lost." § 372.040.

Despite this history, present precedent compels the conclusion that these Plaintiffs' claims cannot proceed—at least not in federal court.[1] That is because Article III of the U.S. Constitution confers on the federal courts the "judicial Power" to decide "[c]ases" and "[c]ontroversies"—that is, to provide "redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Under this rule, a plaintiff has "standing to sue" only if "she has suffered or likely will suffer an injury in fact" that "was caused or will be caused by the defendant" and "likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 378, 380 (2024).

Yet the Plaintiffs in each of these five cases allege that they have never played (much less lost at) the Defendants' games.[2] That is, of course, by design: a claim under § 372.040 aims to recover money lost by "any other person" besides the "loser or his creditor."[3] But by asserting that he's not "himself among the injured," *Sierra*

---

[1] Although the parties raised standing only in passing, the Court ordered supplemental briefing consistent with its "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[2] *See* No. 4:24-cv-86, *Cayce v. VGW, et al.*, DN 49 at 1 & DN 33 at 2; No. 4:24-cv-87, *Cayce v. Zynga*, DN 26 at 2 & DN 1 ¶¶ 12, 33; No. 4:24-cv-88, *Fuqua v. Playtika et al.*, DN 44 at 1 & DN 29 at 2; No. 4:24-cv-90, *Jenkins v. Doubledown Interactive*, DN 38 at 1 & DN 25 at 8, 19; No. 4:24-cv-92, *Gunkel v. Huuuge et al.*, DN 44 at 1 & DN 28 at 2.

[3] This provision states, in full:

**372.040 Suit by third person where loser or creditor does not sue.**

If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

*Club v. Morton*, 405 U.S. 727, 735 (1972), each Plaintiff pleads himself out of federal court because the suit neither "redress[es]" nor "otherwise … protect[s] against" any "injury to the complaining party," *Warth*, 422 U.S. at 499; *accord Burt v. Playtika, Ltd.*, 132 F.4th 398, 401–02 (6th Cir. 2025) ("Because Burt did not incur a gambling loss herself, she did not suffer an injury in fact and therefore lacks standing.").[4]

That the Plaintiffs stand to gain from their lawsuits makes little difference. The sort of "personal stake" that matters for standing looks not to the prospect of gain but instead to the redress of loss. *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (quotation marks omitted). As the Supreme Court put the point years ago, "[a]n interest unrelated to injury in fact"—like a "wager" or "bounty" that's "a byproduct of the suit itself"—"is insufficient to give a plaintiff standing." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772–73 (2000) (quotation marks omitted). Under ordinary standing principles, then, the Plaintiffs cannot proceed in this Court.

The Sixth Circuit diagnosed a nearly identical standing problem just last year. In *Burt v. Playtika*, the plaintiff sued social-casino companies under Tennessee's version of the Statute of Anne, which allows no-loss plaintiffs to recover other people's gambling losses. *See* 132 F.4th at 401–02 (citing TENN. CODE ANN. § 29-19-105). And in that case as in these, "[t]he problem with [the plaintiff's] standing is apparent: she does not allege that she personally suffered any gambling loss." *Id.* at 403.

Doesn't *Burt* dictate the outcome here? No, say the Plaintiffs—resisting the Sixth Circuit's straightforward rule by likening Kentucky's law to a *qui tam* statute. In such "informer" or "relator" suits, the legislature has assigned some sovereign interest to private plaintiffs for recovery through civil litigation—even though traditional property or tort law wouldn't give the plaintiffs a direct stake in the controversy. "[P]rivate attorneys general acts" like these "[i]n some sense … delegate the enforcement of public policy to private parties and reward those who bring suits with bounties like exemplary or statutory damages and attorney's fees." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 45 (2021) (cleaned up). *See also Flast v. Cohen*, 392 U.S. 83, 119 (1968) (Harlan, J., dissenting) ("private attorneys-general" ordinarily proceed "bereft of any personal or proprietary coloration"); *U.S. ex rel.*

---

[4] A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. But precedent recognizes a "limited … exception," in "circumstances where it is necessary," to "grant a third party standing to assert the rights of another," at least where the plaintiff and rightsholder share a "close relationship." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (quotation marks omitted). The Plaintiffs do not invoke this narrow doctrine, however. So the Court needn't consider it. *See, e.g., June Medical Services v. Russo*, 591 U.S. 299, 317 (2020) (plurality opinion) (the "prudential" rule of third-party standing "can be forfeited or waived") (citing *Craig v. Boren,* 429 U.S. 190, 193–94 (1976)).

*Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) (cataloguing these "causes of action for the common weal"). Thanks to "the long tradition of *qui tam* actions in England and the American Colonies," the Plaintiffs point out, the Supreme Court has held that at least some modern statutes with similar features can confer standing on uninjured plaintiffs. *Vermont Agency*, 529 U.S. at 774.[5]

---

[5] Scholars and judges have grappled with and disagreed over how to reconcile *qui tam* and other third-party suits with conventional "injury-cause-redress" standing doctrine. *Compare, e.g.*, Baude & Bray, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 154–55, 158 (2023) (tracing modern standing doctrine to early 20th-century decisions like *Frothingham v. Mellon*, 262 U.S. 447 (1923)), *with, e.g.*, Woolhandler & Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 725–32 (2004) ("For critics of standing doctrine, the history of qui tam statutes decisively refutes arguments that Congress may not delegate to private individuals the right to litigate on behalf of the public.").

On one side, many such claims spring from deep historical roots. Why, thoughtful jurists wonder, should "[a]n 'accepted tradition' that courts can redress a certain type of injury" be "'laid on the examining table and scrutinized for its conformity to' the concrete-injury element more recently devised by the Court?" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 872 (6th Cir. 2020) (Murphy, J., concurring) (quoting *Rita v. United States*, 551 U.S. 338, 379 (2007) (Scalia, J., concurring in part and concurring in the judgment)). Out of respect for history and tradition, judges have used precedent as a benchmark and asked "whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 433 (2021); *see also Coleman v. Miller,* 307 U.S. 433, 460 (1939) (opinion of Frankfurter, J.) (restricting "[j]udicial power" to claims "that were the traditional concern of the courts at Westminster"). And despite a paucity of standing challenges for much of our history, the tradition of informer suits was well settled. *See, e.g.*, *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 722 F. Supp. 607, 609 (N.D. Cal. 1989) ("[T]he First Congress authorized *qui tam* suits in at least 10 of the first 14 statutes imposing penalties."); *Adams v. Woods*, 2 Cranch 336, 341 (1805) ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt as well as by information.").

On the other side, serious lawyers have asked why occasional judicial acquiescence in jurisdictional arrogation should settle the question. Few early decisions, for whatever reason, grappled with case-or-controversy limitations to the same degree as the contemporary Court and academy. *See* Barr, *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 213–14 (1989) ("There is no evidence that the Framers considered the constitutional status of qui tam."). And acquiescence doesn't liquidate constitutional meaning, at least not absent "a course of deliberate practice" in the face of acknowledged constitutional "indeterminacy." Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1, 13 (2019); *see also* THE FEDERALIST No. 37 (Madison) (envisioning that textual "meaning [may] be liquidated and ascertained by a series of particular discussions and adjudications"). For this reason, the longevity of *qui tam* suits might not by itself resolve their constitutional status. *See, e.g.*, Barr at 213 ("A fair reading of the history of qui tam in the United States reveals it as a transitory and aberrational device that never gained a secure

The Sixth Circuit considered and rejected the same argument in *Burt*, however. Taking as given that a *qui tam* plaintiff "has standing because she is the assignee of the government's claim against the defendant," the panel nevertheless rejected the argument that suing under Tennessee's gambling-loss statute gave a plaintiff standing on the same rationale. 132 F.4th at 403–04.

The Plaintiffs' *qui tam* theory here fails the Sixth Circuit's test for the same reasons. All three features that *Burt* treated as distinctive to *qui tam* suits, and therefore dispositive of the standing question, are absent here too.

"First, a qui tam action … is intended to redress an injury to the *government*[,] not a private third party." *Id.* at 404. Kentucky's statute, in contrast, identifies injuries suffered by private parties (rather than the Commonwealth) and nowhere suggests that plaintiffs suing under the statute do so on the Commonwealth's behalf. That may explain why these cases are captioned very differently than most relator suits. As the Supreme Court recently explained, "the caption in … *qui tam* suits designates the plaintiff as 'United States *ex rel.* [the private relator's name].'" *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 424–25 &

---

foothold within our constitutional structure because of its fundamental incompatibility with that structure.").

And many contemporary decisions, including *Vermont Agency* and *Burt*, have found it unnecessary to decide whether *qui tam* standing turns on an assignment of interests that satisfies mainstream modern standing doctrine or else some adjacent historical safe harbor that relieves plaintiffs of the *need* to satisfy the "injury-causation-redress" framework. *Compare Magadia v. Wal-Mart Associates, Inc.*, 999 F.3d 668, 674 (9th Cir. 2021) (Bumatay, J, quoting *Spokeo v. Robins*, 578 U.S. 330, 345 n.\* (2016) (Thomas, J., concurring) (casting *qui tam* as a "well-established exception to the traditional Article III analysis") (quotation marks omitted), *with Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 494 (6th Cir. 2019) (Sutton, J.) (questioning whether *qui tam* suits "are entitled to special solicitude in an Article III standing analysis"). Contemporary decisions have likewise avoided indicating what assignments satisfy (or instead circumvent) the typical standing test. *Compare U.S. ex rel. Milam v. University of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 49 (4th Cir. 1992) (considering *qui tam* standing based on the government's assignment of its own "personal stake in the damages sought"), *with Juniper Networks, Inc. v. Shipley*, 643 F.3d 1346, 1353 (Fed. Cir. 2011) ("[E]ven if the United States suffers no proprietary injury involving diminishment of the federal treasury, [it] suffers an injury when the false marking statute is violated, [so] Juniper had standing to assert a qui tam claim."), *and Duncan v. Liberty Mutual Insurance*, 854 F. App'x 652, 665 (6th Cir. 2021) (likewise focusing on the putative law-enforcement interest asserted by *qui tam* plaintiff); *see also Vermont Agency*, 529 U.S. at 771 (considering both); *United States ex rel. Polansky v. Executive Health Resources*, 599 U.S. 419, 425 (2023) (considering both "injury to the Government's sovereignty" and "injury to its proprietary interests") (cleaned up); *id.* at 450 (Thomas, J., dissenting) (*qui tam* statutes that assign distinctly sovereign interests may conflict with Article II's Vesting and Take Care Clauses).

n.1 (2023) (cleaned up).  Consistent with Kentucky's statute, however, the Plaintiffs in these cases have styled their suits as by and for themselves: *Plaintiff v. Gaming Company*, not *ex rel.* the government or anyone else.[6]

"Second," and closely related to the first factor *Burt* identified, a *qui tam* statute "usually requires that the plaintiff share part of the recovery with the government."  *Burt*, 132 F.4th at 404.  Plaintiffs who prevail under Kentucky's statute, by contrast, pocket *all* their winnings.  § 372.040.  Such claims don't track the relationship between victim, injury, and plaintiff that *Burt* treated as central to a *qui tam* cause of action.  Because "the government receives no direct benefit from the lawsuit," it would be "disingenuous to claim that the suit is brought for the government's benefit and on its behalf."  *Stalley v. Methodist Healthcare*, 517 F.3d 911, 918–19 (6th Cir. 2008).

"Third," because a *qui tam* statute assigns the government's interest, it "usually provides procedural safeguards to ensure that the government retains some control of the action."  *Burt*, 132 F.4th at 404.  The Commonwealth wields no such control over § 372.040 lawsuits.  To the contrary, in some circumstances the Commonwealth could *compete* with private plaintiffs by attempting to step into the losers' shoes and recovering itself.  *See Commonwealth ex rel. Brown v. Stars Interactive Holdings Ltd.*, 617 S.W.3d 792, 798–800, 805 (Ky. 2020) (state may sue under § 372.040 just as "any other person" could).

---

[6] *Burt* did not hold that the Tennessee plaintiff *actually* took up any assigned proprietary or law-enforcement interest.  True, it suggested that "the mere assignment of rights" may not confer standing absent some provision that helps "redress an alleged injury to the state."  132 F.4th at 404.  But it didn't confront the question whether and when a complete assignment of a distinct government interest, by operation of the transitive property, might supply both injury and redressability in satisfaction of Article III.

This Court needn't resolve that question either.  Even more clearly than Tennessee's law, Kentucky's focuses on private injuries that haven't been reassigned: "If the loser or his creditor does not … sue for the money or thing lost … any other person may sue the winner, and recover treble the value of the money or thing lost."  § 372.040.  Certainly nothing suggests that the Kentucky statute assigns the Commonwealth's own proprietary or law-enforcement interests.  Confirming that conclusion, Kentucky's Supreme Court has held that the Commonwealth *itself* can exploit § 372.040 by suing for gambling losses, should the loser decide not to sue, on the same terms as "any [other] person."  *See Commonwealth ex rel. Brown v. Stars Interactive Holdings Ltd.*, 617 S.W.3d 792, 805 (Ky. 2020).  That decision would make little sense if, in pressing such a suit, Kentucky merely picked up its own previously shed interest.  Tennessee's statute, as discussed above, lies further from Kentucky's naked "bounty" model and closer to a "third-party recovery" construct (however hypothetical) that authorizes suits "for the use of" losers' children and families. TENN. CODE ANN. § 29-19-105.

Standing under Kentucky's statute, moreover, is even less plausible than under its Tennessee cousin. That law contains a provision specifying that winning plaintiffs' proceeds are—at least ostensibly—"for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser." TENN. CODE ANN. § 29-19-105; *see Burt*, 132 F.4th at 404 ("[A] plaintiff who sues under § 29-19-105 seeks to redress an injury to a private, third party—the spouse, child, or other relative of an aggrieved player—not the state."). Victorious Kentucky plaintiffs, unlike their Tennessee counterparts, bypass not only the Commonwealth's fisc but also the parties to the transaction purportedly at issue.[7] No proprietary relationship of any sort connects the gambler's losses with the plaintiff's winnings; to the contrary, the plaintiff doesn't receive the actual loss, but rather *three times* the amount lost. So even if Tennessee plaintiffs could squint at their claims and see the redressable injury of someone else, Kentucky claimants would instead see a bounty based on another's gain.[8]

Unable to meaningfully distinguish the Tennessee statute *Burt* considered in 2025, the Plaintiffs exhume a passage from a 1905 decision concerning Ohio's gambling-loss statute:

> We are aware of no provision in the Federal Constitution which prevents this kind of legislation in a state for such a purpose. … Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government. The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer.

---

[7] This feature marks a departure not only from *Burt*'s statute, but also Queen Anne's. *See* 9 STATUTES OF THE REALM at 476 (assigning "one Moiety" of the plaintiff's winnings "to the Use of the Person or Persons that will sue for the same and the other Moiety to the Use of the Poor of the Parish where the Offence shall be committed").

[8] Like the Sixth Circuit in *Burt*, the Supreme Court in *Vermont Agency* had no reason to opine on the constitutionality of *qui tam* suits as a class. *See* Woolhandler & Nelson at 730. *Vermont Agency* addressed *qui tam* litigation under the False Claims Act, where redressability is straightforward: Congress assigned to any willing private plaintiff an interest in vindicating "the proprietary injury resulting from [an] alleged fraud." 529 U.S. at 771. By recovering the lost funds and sharing them with the Government, False Claims Act plaintiffs help the injured party (the United States) secure redress. In these suits, by contrast, the Plaintiffs sue based on the injuries of players—who cannot possibly receive redress through the Plaintiffs' recovery.

7

*Marvin v. Trout*, 199 U.S. 212, 225 (1905). To the Plaintiffs, this handful of sentences renders the standing question asked and answered. The difficult issues raised here and in *Burt*, they insist, have actually been settled since the time of Melville Fuller.

But *Marvin* cannot bear so much weight. For one thing, the opinion didn't mention Article III or the limits of "the judicial Power" at all. Rather, this passing comment rejected a forfeited claim premised on the Fourteenth Amendment's Due Process Clause. Two, the Court's seminal standing decisions don't treat *Marvin* as controlling—or even instructive—in considering whether and when a plaintiff has a redressable injury-in-fact. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998); *but see id.* at 129–30 (Stevens, J., concurring in judgment) (burying *Marvin* in a string citation). Three, even the *Vermont Agency* Court's exhaustive treatment of third-party recovery in the *qui tam* context didn't bother to cite *Marvin*. Perhaps for these reasons, *Burt* didn't mention (much less purport to "follow") *Marvin*, either. "Given the limitations on both the issues presented and the holding in *Marvin*, that case cannot be cited with any credibility as a considered holding on the issue of standing under the [False Claims Act]." *Riley v. St. Luke's Episcopal Hospital*, 196 F.3d 514, 534 (5th Cir. 1999) (DeMoss, J., specially concurring) (*vacated*, 196 F.3d 561). Kentucky's law departs from the tradition of *qui tam* lawsuits described in *Vermont Agency*—and therefore Kentucky plaintiffs in federal court cannot trace a redressable injury through any such analogy.

The allegations at issue under Kentucky's statute likewise deviate from those decisions—outside the *qui tam* context—allowing uninjured plaintiffs to sue as assignees of private (rather than public) interests. Similar to a *qui tam* statute that "effect[s] a partial assignment of the Government's … claim," *Vermont Agency*, 529 U.S. at 772–73, private parties can sometimes pass "legal title" to their claims and thereby allow unharmed plaintiffs to "assert what are, due to that transfer, legal rights of their own," *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 290 (2008) (emphasis deleted). An assignment like this, however, usually requires an "express agreement …, showing that [the injured parties] manifested an intent to assign their right to sue." *Burt*, 132 F.4th at 404 n.3 (citing *Herr v. U.S. Forest Service*, 803 F.3d 809, 821 (6th Cir. 2015)); *see also* 6A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1545 (3d ed., supp. Sept. 2025). As in *Burt*, the Plaintiffs in these cases allege nothing of the kind.[9]

---

[9] Neither do they argue that Kentucky's statute, by itself, assigns any private interests. Rather than directly transferring property rights, Kentucky's statute assigns the procedural right to press a civil suit. *See, e.g.*, Pfander, *Public Law Litigation in Eighteenth Century America*, 92 FORDHAM L. REV. 469, 476 (2023) (distinguishing moiety statutes from qui tam statutes).

These problems, of course, needn't doom the Plaintiffs' claims.  At least not if they can establish standing under the more relaxed principles that may apply outside Article III and inside the Commonwealth's courts of general jurisdiction.  *Cf. Stars Interactive*, 617 S.W.3d at 801 (explaining that § 372.040 "enabl[es] 'any person' to file civil lawsuits").  But under Sixth Circuit precedent interpreting the Federal Constitution, these claims may not proceed in this Court.

### ORDER

The Court dismisses these cases for lack of subject-matter jurisdiction and denies as moot all pending motions.

Benjamin Beaton, District Judge

United States District Court

March 26, 2026

9